**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**SINOLAM LNG TERMINAL, S.A.**, a Panama
company, and
**SINOLAM SMARTER ENERGY LNG POWER
CO.**, a Panama company,

      **Plaintiffs,**

**V.**                                                 **CASE NO.:** 1:26-cv-00520

**APPLIED ENERGY SERVICES, Inc.**, **a/k/a THE AES CORPORATION,**
a Virginia-headquartered company,
**INTERENERGY HOLDINGS (UK) LIMITED**, a UK company, and
**GROUP ENERGY GAS PANAMA S. de R.L.**, a Panama company,

      **Defendants.**

## <u>AMENDED COMPLAINT</u>

### INTRODUCTION

1. COME NOW Plaintiffs, Sinolam LNG Terminal, S.A. ("**Sinolam Terminal**") and Sinolam Smarter Energy LNG Power Co. ("**Sinolam Power**" and, together with Sinolam Terminal, the "**Plaintiffs**"), by and through the undersigned attorneys, and for their Amended Complaint against Defendants Applied Energy Services, Inc. a/k/a The AES Corporation ("**AES**"), InterEnergy Holdings (UK) Limited ("**InterEnergy**"), and Group Energy Gas Panama S. de R.L. ("**Group Energy**" and, together with AES and InterEnergy, "**Defendants**"), state as follows:

2. Defendants schemed to illegally oust and exclude Plaintiffs from the business opportunities they had secured to both develop and operate a power plant fueled by liquified natural gas ("**LNG**") in the Republic of Panama ("**Panama**"), and to build an LNG terminal to store,

1

regasify, and transmit LNG to customers. The storage and processing of LNG at terminal facilities is a highly lucrative business, and Defendants' sole competitors in the growing Panamanian LNG-to-power market were Plaintiffs. In short, AES wanted a monopoly, not a competitor.

3. AES is a Fortune 500 global power company. AES has numerous subsidiaries and affiliates, both wholly owned and indirectly majority owned by AES across Latin America, including several incorporated in Panama.

4. Prior to the beginning of the conspiracy described below, AES initially attempted to force Plaintiffs out of the LNG market through coercion. At meetings that took place in 2016 in Arlington, Virginia, AES pressured Sinolam Terminal to abandon its terminal project in Panama and to invest in AES's project in an effort to convert Plaintiffs from competitors to AES's customers and/or investors.

5. Following months of negotiations and heated meetings that took place at AES's headquarters in Arlington, Virginia, Plaintiffs rejected AES's proposals. When Plaintiffs refused to bow to AES's demands, AES pivoted to seeking to end Plaintiffs' participation in the market, ultimately conspiring with InterEnergy and Group Energy to ensure Plaintiffs' project would either be destroyed or rendered worthless.

6. AES found a willing partner in InterEnergy. AES and InterEnergy previously had done business together in the natural gas market in the Dominican Republic, which facilitated the parties' joining forces in Panama. As would later become evident, AES and InterEnergy devised a preliminary plan to lure Plaintiffs into providing confidential information about their LNG project that Defendants would later use to destroy Plaintiffs' project through actions taken by Defendants, all orchestrated by and through AES from Arlington.

7. In furtherance of this plan, the Chief Executive Officer ("**CEO**") and Chairman of InterEnergy, Mr. Rolando Gonzalez-Bunster, traveled from his home in Greenwich, Connecticut to Panama to meet with Plaintiffs in 2019 and discuss a purported business relationship.

8. As a result of that meeting and other discussions, InterEnergy obtained confidential information about Plaintiffs' business pursuant to a non-disclosure agreement that InterEnergy executed with Plaintiffs in 2019. At the time of these meetings and discussions, InterEnergy had no intention of entering into a business relationship with Plaintiffs but instead had engaged in discussions with Plaintiffs under false pretenses. The real purpose of this façade was to gain access to Plaintiffs' confidential business information.

9. AES and InterEnergy thereafter incorporated a joint venture in Panama, Group Energy, in November 2020, in which InterEnergy held a 51% stake and AES held a 49% stake through an intermediary company. Beginning in 2021, AES and InterEnergy would use Group Energy as a vehicle to suppress and ultimately to exclude competition from Plaintiffs and end Plaintiffs' participation in the LNG-to-power market in Panama. Upon information and belief, at times relevant to this action, one or more individuals served roles at both AES and Group Energy, and carried out these roles (including participating in the conduct alleged herein) from AES's offices in Virginia.

10. AES acted in concert with InterEnergy and Group Energy to: (a) delay Sinolam Power's permits and ultimately procure the cancellation of Sinolam Power's license to develop a power plant; (b) tortiously interfere with the power purchase agreements ("**PPAs**") that Sinolam Power had secured with three local electricity distributors in Panama and render them worthless; (c) prevent Sinolam Power from supplying electricity to other identified

customers under long-term agreements, such as Panamá Colón Container Port ("**PCCP**"); (d) prevent Sinolam Power from supplying electricity to other long-term purchasers pursuant to other tenders issued by the regulatory authorities, which it could do given its excess capacity; (e) prevent Sinolam Power from supplying electricity on the spot market in Panama; (f) tortiously interfere with the contracts that Sinolam Terminal had executed with its two major customers, Sinolam Power and the NG Parties (defined below) and render them worthless; and (g) prevent Sinolam Terminal from executing long-term agreements and spot-market trading with other customers through planned and expected expansion of the terminal facilities. AES and InterEnergy, acting together with and through Group Energy, unlawfully shut out Plaintiffs to become the only operators in the lucrative LNG-to-power market in Panama.  Upon information and belief, to effectuate this collaboration with AES, representatives of InterEnergy and Group Energy continuously reached into Virginia, via email, telephone and video conferences, and in-person meetings, at all times relevant to this action.

11. Defendants initiated, directed, and executed this unlawful scheme from AES's headquarters in Arlington, Virginia and the wrongful acts described below either occurred in Virginia or resulted from discussions with or directions given by AES from its Arlington headquarters. Defendants' actions harmed Plaintiffs to the tune of billions of dollars in lost revenues and have left Plaintiffs with hundreds of millions of dollars in sunk investments and liabilities.

## THE PARTIES

12. Plaintiff Sinolam LNG Terminal, S.A. is incorporated under the laws of the Republic of Panama and has its principal office address at Ocean Business Plaza, 18th Floor, Marbella, Panama City, Republic of Panama.

13.     Plaintiff Sinolam Smarter Energy LNG Power Co. is incorporated under the laws of the Republic of Panama and has its principal office address at Ocean Business Plaza, 18th Floor, Marbella, Panama City, Republic of Panama.

14.     Plaintiffs are wholly owned by Sinolam International Pte. Ltd., which is a Singaporean company. Mr. Kenneth Zhang is the Plaintiffs' Chairman. Since 2020, he has been a citizen only of Saint Lucia. He attended Chicago-Kent College of Law at the Illinois Institute of Technology for his Master of Laws and Kellogg School of Management at Northwestern University for his Master of Business Administration. He has residences in New Jersey and Panama.

15.     Defendant Applied Energy Services, Inc., a/k/a The AES Corporation, is incorporated in the State of Delaware and is publicly traded on the New York Stock Exchange under the ticker "AES." Its principal office address is located at 4300 Wilson Boulevard, Suite 1100, Arlington, Virginia 22203, U.S.A.

16.     Defendant InterEnergy Holdings (UK) Limited is incorporated in the United Kingdom, with its registered office address at 5th Floor, 10 Brook Street, Mayfair, London W1S 1BG, United Kingdom.

17.     Defendant Group Energy Gas Panama S. de R.L. is incorporated in the Republic of Panama with its principal place of business at PH Plaza 58, Calle 58 Este, Obarrio Ciudad de Panama, Republic of Panama with an alternate address at La Rotonda Avenue, Business Park II, Tower V, 11th floor, borough of Parque Lefevre, District of Panama, Province of Panama, Republic of Panama.

**JURISDICTION AND VENUE**

18.  The United States District Court for the Eastern District of Virginia does not have subject matter jurisdiction over this case.

19.  The Arlington County Circuit Court has subject matter jurisdiction over this action pursuant to Virginia Code §17.1-513.

20.  The Arlington County Circuit Court has general personal jurisdiction over AES pursuant to Virginia Code §§8.01-328.1 (1) and (3) and specific personal jurisdiction over all Defendants, pursuant to Virginia Code §8.01-328.1, because of their participation in the conspiracies and other tortious conduct described in this action. As set out herein, the tortious conduct was directed from Virginia; the conspiracy was hatched in, directed, and supervised from Virginia; meetings between Plaintiffs and AES took place in Virginia; internal AES meetings and meetings between the Defendants took place in Virginia in which the tortious interference and conspiracy were discussed, orchestrated, and supervised; directors and officers of AES conducted business related to the tortious interference and conspiracy in Virginia and communicated with their subsidiaries in meetings there and emanating from there; the conduct in furtherance of the conspiracies was undertaken in Virginia; and much of the other tortious conduct occurred in Virginia.

21.  Venue is appropriate in the Arlington Circuit Court pursuant to Virginia Code §§8.01-262 (1), (2), (3), and (4).

22.  From 2016 onwards, Plaintiffs primarily dealt with senior employees, officers and directors of AES who were chiefly based in Arlington, Virginia, including:

a.  Mr. Didier Rotsaert, Managing Director for Mergers & Acquisitions, AES;

b.  Bernerd Da Santos, Chief Operating Officer and Executive Vice President, AES;

6

c.  Manuel Perez Dubuc, President, MCAC, AES;

d.  Gustavo Pimenta, Chief Financial Officer, MCAC, AES;

e.  Nicolas van Tienhoven, Treasury Director, MCAC, AES;

f.  Oscar Manuel Batres, Senior Manager, Corporate and Project Finance, MCAC, AES;

g.  Gustavo Garaviglia, Development and Transaction Senior Manager, MCAC, AES;

h.  Jeffrey MacKay, who held several roles working for AES affiliates in Panama between May 2018 and August 2024;

i.  Juan Ignacio Rubiolo, President, MCAC, AES between March 2018 and February 2022;

j.  Kristina Lund, who served as Chief Financial Officer for MCAC, AES, based in Panama from March 2018 to April 2020; and

k.  Jose Gregorio Sousa, who served as Deputy General Manager for an AES affiliate in Panama between March 2016 and August 2018.

**FACTUAL BACKGROUND**

I.  **LNG Terminal Services Are Profitable**

23.  Liquified natural gas, or LNG, is exactly what its name describes: the liquid form of natural gas. Natural gas is cooled into liquid for easier transportation and storage. Natural gas has become an economical and environmentally friendly way to create power. To power a natural gas power plant, LNG must be unloaded from transport vessels or tankers, stored, converted back into gas form, and then transported to a power plant, usually via pipelines. This process of unloading LNG from a cargo ship and converting it to gas form is done at a specialized facility called an LNG terminal.

7

24. Significant investment in the U.S. shale gas industry has resulted in massive export of LNG from U.S.-based companies to the rest of the world. Currently, there are over eight operating LNG export terminals in the United States, with several more under construction.

25. LNG-fueled power plants require LNG terminals to receive, store, and regasify LNG from liquid to natural gas, which is then transmitted via pipelines to the nearby power plants.

26. In Panama, electricity generated by LNG-fueled power plants is supplied to electricity distributors through Panama's transmission grid. Power generators can only contract up to the capacity of their power plants, which capacity is specified in the licenses awarded by a Panama regulator, Autoridad Nacional de los Servicios Públicos ("**ASEP**").

27. Power generators are also limited in terms of their market share of the electricity sector. The Panama Energy Law limits the ability of power generators and their owners to control (directly or through affiliates) more than 40% of the national market demand for electricity. (Article 59.2 of Law No. 6 of 1997, amended by Cabinet Resolution No. 76 of 2005).

## II.     Sinolam Power Secured the License for the Sinolam Power Project and the Concession to Sell Electricity to Local Distributors

28. Plaintiffs recognized a commercial opportunity to invest in the growing LNG-to-power and LNG terminal market in Panama (the "**Sinolam Project**").

29. In 2015, Sinolam Power was one of only two players in that market. In 2015, Panama's state-owned electricity company Empresa de Transmisión Eléctrica S.A. ("**ETESA**") carried out two bidding processes for long-term contracting of power and energy supply for thermoelectric power generation plants. An indirect subsidiary of AES called Gas Natural Atlántico, S. de R.L. ("**Gas Natural**"), won the first bid in 2015.

30.    On May 20, 2015, Sinolam Power (then called Martano Inc.) obtained Provisional License Number 262-15 (the "**Provisional License**") to build and operate a 325 MW LNG-fired power plant in Puerto Pilón, Colón (the "**Sinolam Power Plant**").

31.    On December 10, 2015, ETESA awarded Sinolam Power a fifteen-year concession (the "**Sinolam Power Concession**") to supply power and energy and meet the needs of three local distribution companies, Elektra Noreste, S.A. ("**ENSA**"), Empresa de Distribución Eléctrica Metro Oeste, S.A. ("**EDEMET**"), and Empresa de Distribución Eléctrica Chiriquí, S.A. ("**EDECHI**"). Sinolam Power promptly began the process of obtaining permits to build the Sinolam Power Plant.

32.    After securing both the Provisional License to build the Sinolam Power Plant and the Sinolam Power Concession to supply electricity generated from the Sinolam Power Plant to local distribution companies, Sinolam Power entered into long-term PPAs with each of the distribution companies on January 8, 2016 (the "**Sinolam PPAs**"). Under the Sinolam PPAs, Sinolam Power would supply 196MW to EDEMET, 126MW to ENSA, and 28MW to EDECHI, for a total of 350MW.

33.    ASEP subsequently extended Sinolam Power's Provisional License and increased the Sinolam Power Plant's installed capacity to 400 MW on June 30, 2016, and then to 441MW on July 10, 2017. This additional MW capacity (in excess of the 350MW allocated under the Sinolam PPAs) would be sold to other customers, under long-term agreements with identified customers, such as PCCP, or on the lucrative spot market.

34.    In December 2017, Sinolam Power entered into a suite of agreements with Shanghai Electric Group Co., Ltd. and its affiliates for the design and construction of the Sinolam Power Plant. In August 2017, Sinolam Power engaged U.S. law firms to represent it in

negotiations with potential suppliers of U.S. LNG and concerning regulatory issues for potential investments in U.S. natural gas fields.

35. On February 1, 2018, Sinolam Power received definitive License No. 375-18 (the "**Sinolam License**") for the construction, maintenance, and production of electricity at the Sinolam Power Plant and subsequent sale to distributors in Panama.

36. Sinolam Power materially advanced the development of its Power Plant. For instance, on June 29, 2018, Sinolam Power entered into a Long-Term Program Contract with Siemens S.A. for the supply of, and services in relation to, various turbine components needed for the Sinolam Power Plant. On January 21, 2020, Sinolam Power entered into an Operation & Maintenance Agreement with EthosEnergy (GBR) Limited, a Scottish company, to operate and maintain the Sinolam Power Plant. Sinolam Power incurred substantial expenses and obligations under these and other contracts.

### III.    Sinolam Terminal Made Plans to Develop LNG Terminal Facilities

37. Sinolam Power needed access to a maritime LNG terminal to receive, store, and regasify LNG from liquid to gas to supply the Sinolam Power Plant and other potential users.

38. From 2016 onwards, Sinolam Terminal engaged well-credentialed consultants and professionals located in the United States and elsewhere to advise on the design, specifications, and economics of a potential LNG terminal to be built near the Sinolam Power Plant.

39. The Sinolam LNG Terminal was originally designed to provide services to the Sinolam Power Plant, which would be its first customer. That arrangement was memorialized in an LNG Sale and Storage Agreement signed by Sinolam Terminal and Sinolam Power on August 22, 2019, that was accompanied by an LNG Terminal Use Agreement. Under this

10

agreement, Sinolam Terminal would have received annual terminal fees from Sinolam Power totaling on average thirty million dollars over 40 years, and Sinolam Power would have had access to a reliable supply of LNG to fuel the Sinolam Power Plant.

**IV.    AES Wanted Plaintiffs to Abandon the Sinolam LNG Terminal and Invest in the AES Project**

40.    In 2016, AES and its affiliates constituted the only other group of entities in Panama competing in the LNG-to-power market. In 2015, Gas Natural won a tender to construct AES Colon power station with a capacity of 350MW (the "**AES Power Plant**"), which would be paired with an adjacent LNG terminal called the Costa Norte LNG Terminal that would be constructed by Costa Norte LNG Terminal S. de R.L. ("**AES Costa Norte**") (the "**AES Terminal**" and, together with the AES Power Plant, the "**AES Project**").

41.    Construction of the AES Project began in 2016. The AES Project began operating in 2018, and the AES Terminal became fully operational in 2019.

42.    AES developed the AES Project as though it had expected to win both tenders for power generation in 2015. AES leased land sizable enough to build two power plants, which was more than double the power capacity ASEP ultimately licensed Gas Natural to generate. AES also designed the AES Terminal to be large enough to service multiple power plants. The AES Terminal's initial design capacity was 1.5 million tons per annum ("**mtpa**") of LNG imports and a storage tank capacity of 180,000 cubic meters. This up-front investment of nearly two billion dollars meant that AES needed a second power plant to serve as its customer for the AES Terminal in order to be profitable.

43.    Sinolam Power's win of the second power plant tender and development of its own LNG terminal served a major blow to AES, which had counted on winning both power plant tenders to be economically viable.

11

44.   AES therefore set out to prevent the development of the Sinolam Project. Throughout 2016, AES pressured Plaintiffs to invest in the AES Project, to become a customer of the AES Terminal, and to abandon the Sinolam Power Plant site and move the plant to AES's site in an effort to reduce AES's land rental fees.

45.   Plaintiffs received communications and messages from prominent Panamanian businessmen, including from AES's business partner, Mr. Stanley Motta, who strongly communicated and encouraged that Plaintiffs should find a way to work with AES. Mr. Motta held ownership interests in AES affiliates in Panama, such as Gas Natural and AES Costa Norte, through his investment fund, Inversiones Bahía.

46.   AES escalated the pressure. In 2016, Plaintiffs' Chairman, Mr. Kenneth Zhang, was lured into a warehouse by individuals that Mr. Zhang understood were sent at AES's behest. His abductors physically threatened him, warning again that he should comply with AES's demands. When released, Mr. Zhang hired private security to protect him at his residence and in public.

47.   Out of fear, Mr. Zhang met with Mr. Gustavo Pimenta, the AES Chief Financial Officer for Mexico, Central America and the Caribbean Region ("**MCAC**"), a strategic business unit of AES. In these discussions, AES offered unrealistic commercial terms that would have suffocated Plaintiffs' business, such as extremely high terminal use fees and refusal to grant Sinolam Power Plant equal priority rights to use the AES Terminal. The proposal meant that the AES Terminal would always service the needs of the AES Power Plant first ahead of the Sinolam Power Plant.

48.   Plaintiffs negotiated in good faith with AES's representatives, partly out of fear of further harm and retaliation. But whenever Plaintiffs brought up commercial terms related to the

AES Terminal, Mr. Pimenta and other representatives of AES revealed that only AES's officers in the AES Virginia headquarters had decision-making authority on those issues. AES's local representatives in Panama lacked authority to negotiate on behalf of AES. Rather, instructions and direction came from AES's headquarters in Virginia.

49.    AES was very clear in its communications that Plaintiffs could only communicate with two AES representatives for any bid they might submit. In a letter to Mr. Zhang dated March 10, 2016, Mr. Didier Rotsaert, the Managing Director for Mergers & Acquisitions of AES, instructed Mr. Zhang that he should communicate only with him, based in AES's Arlington headquarters, and Mr. Pimenta, who was based in Panama. AES's letter admonished, "Any questions or comments regarding your Indicative Offer, the process, and the Sellers should be directed exclusively to the AES individuals listed above," *i.e.*, Messrs. Rotsaert and Pimenta.

50.    Plaintiffs continued to attempt to negotiate in good faith with AES. Plaintiffs made a non-binding offer in May 2016 to purchase a minority equity stake in the AES Power Plant and the AES Terminal but ultimately declined to commit to using the AES Terminal to serve the Sinolam Power Plant given AES's unreasonable terms.

51.    AES did not accept Plaintiffs' rejection and lack of commitment to AES. AES turned up the pressure. In late 2016, AES invited Mr. Zhang to meetings at its headquarters in Arlington, Virginia. Many senior executives from AES attended the meeting, such as John Bigalbal, Managing Director at AES. Mr. Zhang recalls that at least three other executives from AES headquarters attended the meetings, likely including some of the individuals listed in paragraph 22 above.

52. The material terms AES proposed still included unreasonably high terminal use fees and AES-priority for terminal use whenever there was conflicting demand between the needs of AES and Sinolam Power. Moreover, Plaintiffs were required to sublease—at prices exceeding market terms—excess land from AES that AES had optimistically leased initially for construction of a second power plant that it no longer needed to build given that Sinolam Power had won the second bid.

53. Over three or four days of intense negotiations at its offices in Virginia, AES delivered an unyielding message that Plaintiffs should accept AES's terms and become AES Terminal's customer. AES did not want Sinolam Terminal to be a direct competitor that owned its own LNG terminal.

54. AES made clear during these meetings that if Plaintiffs agreed to AES's demands, then Sinolam Power likely would find that any local, bureaucratic issues it was facing would lessen or disappear. Plaintiffs understood AES's representations to be a thinly veiled threat that if they refused AES's harsh terms, AES would use its influence and connections with influential businessmen and government officials in Panama to torpedo the Sinolam Project.

55. Plaintiffs refused to buckle under AES's threats. After completing their due diligence, Plaintiffs decided that AES's proposed terms were unreasonable. The terminal-use fees alone would eviscerate around 80-90% of Sinolam Power's expected profits, which would jeopardize Plaintiffs' ability to get financing. Plaintiffs instead moved forward with building the Sinolam Power Plant and the Sinolam LNG Terminal on their own sites and again declining to do business with AES.

56. Sinolam Power sent a letter on November 16, 2016, addressed to Mr. Pimenta, explaining that having:

> …completed our economic, technical, and risk assessment of the different options for site selection, LNG storage and regasification for Martano [Sinolam Power], as well as considering our time schedule, we have decided to continue with an alternative other than the one negotiated with AES.

57. Promptly after Plaintiffs emailed this letter, Mr. Pimenta telephoned Plaintiffs' Chairman, Mr. Zhang, and threatened to sue Plaintiffs on the basis that they allegedly were stealing AES's confidential information that AES had provided to Plaintiffs during the bidding process. Intimidated by Mr. Pimenta's threats, irrespective of no wrongdoing, Plaintiffs deleted information and documents received from AES during the negotiations and meetings from their files. Subsequently, Mr. Zhang learned these threats were simply intimidation tactics that AES used to destroy any paper trail of communication between AES and potential bidders, such as Plaintiffs.

58. Mr. Miguel Heras, a Wharton School graduate and close associate of the Motta family, who had significant political connections of his own in Panama, contacted Mr. Zhang. During the meetings held in Virginia at AES's headquarters, AES had mentioned the political connections that Mr. Heras enjoyed with government officials in Panama. Mr. Heras threatened Mr. Zhang that because Plaintiffs had refused to submit to AES's demands, the Sinolam Project simply would not advance.

59. In 2016, Mr. Zhang hired a private security detail to protect him. Since then, Mr. Zhang has suffered increased threats to his safety. His apartment was broken into. People started following him. One member of the security team identifies potential dangers to Mr. Zhang based on the meetings he is scheduling, taking into account their locations. Other members of the security team serve as bodyguards, rotating to provide security 24 hours a day, seven

days a week. When Mr. Zhang is in Panama, he is constantly in fear for his safety and that of his family.

**V.      Plaintiffs Proceeded to Develop the Sinolam Project, Including the Sinolam LNG Terminal, Without AES**

60.    Plaintiffs wanted to participate in the lucrative LNG-to-power market in Panama and had invested and continued to invest significant costs for such participation. In the following months, Plaintiffs efficiently and methodically went about developing the Sinolam Project. For instance, Plaintiffs executed material engineering, procurement, and construction ("**EPC**") contracts with contractors and subcontractors; began work on the infrastructure projects; diligently applied for necessary permits and approvals; and negotiated financing from various lenders, including a U.S.-based investment bank regarding potential underwriting of a bond offering.

61.    While developing the Sinolam Project, Plaintiffs also explored opportunities with other potential players in the market. In 2017, Plaintiffs began negotiating with a local company called LNG Group Panama, S.A. and its subsidiary, Panama NG Power, S.A., ("**NG Power**") (together, the "**NG Parties**"). NG Power had received a license to develop a 670 MW power plant that would be located on Isla Telfers near the port of Colón ("**NG Power Plant**"). NG Power also had plans to build an LNG terminal at the site of the NG Power Plant (the "**NG Terminal**") (together with the NG Power Plant, the "**NG Project**").

62.    In early 2017, Plaintiffs began negotiating a potential acquisition of NG Power. However, other investors known to the Plaintiffs ultimately acquired the NG Parties. Thereafter, Plaintiffs and the NG Parties' new owners continued to explore ways to do business together, including the possibility that Sinolam Power might become a customer of the envisaged NG Terminal.

63. By mid-2018, it became apparent that NG Power would not be able to develop the NG Terminal on time. Sinolam Terminal therefore decided to develop a larger terminal with capacity to support the needs of both the Sinolam Power Plant and the NG Power Plant.

64. The NG Parties thus became Sinolam Terminal's second customer (Sinolam Power being the first). On July 30, 2018, Sinolam Terminal and the NG Parties entered into a Terminal Use Agreement whereby Sinolam Terminal agreed to provide terminal services to NG Power (the "**NG TUA**"). Under the NG TUA, the NG Parties would pay Sinolam Terminal for services that included receiving LNG tankers at the jetty; unloading the cargoes and storing them at the floating storage unit (the "**FSU**"); measuring and assessing the quality of the delivered LNG; storing, processing and then regasifying the LNG; and delivering gas at the gas delivery point to a pipeline system for transport to Sinolam Terminal's customers, *i.e.* the Sinolam Power Plant and the NG Power Plant. The NG TUA provided for nearly fifty million dollars in revenue annually for Sinolam Terminal.

65. On September 10, 2018, Sinolam Terminal signed an LNG Sale and Purchase Agreement with Shell International Trading Middle East Limited for Sinolam Terminal to purchase up to 23,400,000 MMBtu per year of LNG (the "**Shell Agreement**").

66. The LNG would be supplied from U.S. exporters with which Shell had existing relationships (either contractually or as an investor). The Shell Agreement included LNG supply amounts for both the Sinolam Power Plant and the NG Power Plant.

67. Sinolam Terminal expanded the scale of its terminal to serve these two customers. On September 15, 2018, Sinolam Terminal signed an EPC contract with Wuhuan Engineering Co., Ltd. to build a terminal that would accommodate both Sinolam Power's and NG Power's usage of Sinolam Terminal's services. The Sinolam LNG Terminal had additional

capacity to service other customers, and Sinolam Terminal's plans included financing further expansion of capacity given the importance of Panama as an LNG hub receiving imports from U.S. LNG suppliers.

68. Construction of the Sinolam LNG Terminal commenced in October 2018.

69. Sinolam Terminal also investigated options with an FSU charter company that could provide a vessel large enough to accommodate the extra LNG cargoes needed by NG Power. On August 27, 2019, Sinolam Terminal entered into a time charter agreement with Gas-Two Ltd., which is an international owner, manager, and operator of LNG carriers. Under the agreement, Gas-Two Ltd. would lease Sinolam Terminal an FSU with a cargo capacity of 155,000 cubic meters of LNG for approximately $65,000 per day (as opposed to approximately $45,000 per day for a smaller vessel designed for supplying primarily Sinolam Power). Sinolam Terminal secured its substantial obligations by granting Gas-Two Ltd. a mortgage over the two land parcels Plaintiffs had acquired for the Sinolam Power Plant and the Sinolam LNG Terminal (land for which Plaintiffs had invested more than forty million dollars in clearing and improving). In addition, Sinolam Terminal invested several millions of dollars to upgrade the FSU to suit the needs of its two customers.

70. Subsequently, Sinolam Terminal also renegotiated the NG TUA with the NG Parties. Sinolam Terminal understood that the NG Parties were delayed in completing the NG Power Plant and were under considerable financial pressure. If the NG Power Plant was not completed and operational according to the expected schedule, this would affect the return on investment of the Sinolam LNG Terminal, which would affect potential investors and lenders to the Sinolam Project.

71.   Sinolam Terminal and the NG Parties executed a settlement and amendment to the NG TUA on October 30, 2020 (the "**Amended NG TUA**") to mitigate the impact of the NG Power Plant's delays and to protect Plaintiffs' interests. In the Amended NG TUA, the NG Parties agreed that NG Power would use the Sinolam LNG Terminal exclusively, pledged the NG Parties' assets as collateral in the amount of fifteen million dollars, and gave Sinolam Power the option to merge NG Power into itself.

72.   The Amended NG TUA was critically important to the future of the Sinolam LNG Terminal, which had been designed and was being developed and financed in reliance on NG Power's business as a customer.

73.   Sinolam Terminal also had established a natural gas trading company to actively expand its natural gas customer base in the United States and Caribbean region. To that effect, Sinolam Terminal was negotiating with U.S. natural gas producers either to make an investment in Plaintiffs or to secure supplies for Sinolam LNG Terminal to trade through its hub in Panama. It was also in discussions with the Municipality of Colón to be a supplier of LNG. Sinolam Terminal sought to actively trade in the spot market given the routing of vessels passing from North America to Central America for local use or onward voyage to other parts of the world. This is precisely what Costa Norte LNG Terminal has done.

### VI.   Defendants Interfered with Plaintiffs' LNG-to-Power Business, Including Its Various Contractual Relationships

74.   Unable to coerce Plaintiffs into abandoning the Sinolam Project and unable to survive economically given the size of the leased land for the AES Power Plant and the infrastructure costs of the sizable AES Terminal, AES set out to monopolize the LNG-to-power market. AES's position was that if it could force every natural gas power plant to use the AES Terminal, AES would control the Panamanian natural gas market. AES also

knew that it could not achieve its goals without the help of others. It started laying the groundwork for the conspiracy that ultimately destroyed Plaintiffs' business. As described further below, this scheme ultimately included effectively acquiring the LNG business of NG Power and ousting Plaintiffs from the market.

75.  AES needed third parties to use the AES Terminal because it had excess, unused capacity. The AES Terminal has a capacity of 1.5 mtpa. Only around 25% of this capacity was dedicated to supplying the AES Power Plant. AES therefore needed to market or sell the remaining capacity to third parties to receive the expected return on its investment to construct, build, and operate the AES Terminal. AES also sought to eliminate or minimize the potential market share of its two LNG-to-power market competitors, namely, Plaintiffs and the NG Parties.

76.  In late 2019, InterEnergy approached Plaintiffs out of the blue with a proposal to inject equity into the Sinolam Project. InterEnergy's Founder, CEO, and Chairman, Mr. Rolando Gonzalez-Bunster flew to Panama to meet Mr. Zhang and communicate InterEnergy's intent on working with Plaintiffs. Messrs. Gonzalez-Bunster and Zhang had dinner in Panama City and discussed InterEnergy's claimed interest in providing equity financing to the Sinolam Project.

77.  Sinolam Power and InterEnergy executed a Non-Disclosure and Confidentiality Agreement on October 31, 2019, pursuant to which Sinolam Power confidentially shared documents relating to the Sinolam Project, including confidential information about why the Sinolam LNG Terminal had to be expanded to accommodate the NG Parties' needs (the **"InterEnergy NDA"**).

78.    InterEnergy received the confidential and proprietary information and documents from Sinolam Power and then disappeared. It did not engage with Plaintiffs any further or meaningfully respond to repeated outreach from Plaintiffs. It never made any offer to Plaintiffs.

79.    AES's desire to acquire NG Power ran into two difficulties. *First*, by virtue of its ownership of the AES Power Plant and various hydroelectric power plants in Panama, AES was at or very close to the cap on market share of 40% that Panamanian law imposed on any single entity generating power for consumption in Panama through vehicles that it owned or controlled. Therefore, AES could not acquire NG Power outright. An investor presentation prepared by AES Panamá in May 2021 indicated that AES's market share in Panama already was at 41%.[1]

80.    *Second*, NG Power had agreed in the Amended NG TUA to procure LNG terminal services for the NG Power Plant exclusively from Sinolam Terminal. Even if AES could acquire NG Power, it would have to do business with AES's competitor, Sinolam Terminal.

81.    InterEnergy, a U.K.-based energy company, was a close business partner of AES in other Central American countries, such as the Dominican Republic, but it had not previously participated in the LNG market in Panama. AES and InterEnergy joined forces to destroy the competition.

82.    AES and InterEnergy devised a scheme to oust NG Power altogether and simply announce a new corporate vehicle that would construct, develop, and operate a power plant with precisely the same capacity (670MW) and at precisely the same location, Isla Telfers,

---

[1] AES Panama, Investor Presentation, May 2021, *available at* https://www.aespanama.com/sites/default/files/2021-07/Panama%20-%20Investor%20Presentation%20202105.pdf.

proposed by NG Power, and somehow acquire NG Power's PPAs and other critical assets from its newly-reinstated local shareholders.

83.   Upon information and belief, as part of this plan, AES and InterEnergy procured José Alejandro Rojas Pardini, who had been appointed as the Minister Counselor for the Facilitation of Private Investment, to interfere with the NG TUA and Amended NG TUA. In August of 2019, Mr. Rojas contacted Mr. Zhang and demanded that he convince the shareholders of the NG Parties to sell their shares back to the original shareholders. Mr. Zhang knew those shareholders given Plaintiffs had been doing business with the NG Parties. Subsequently, in November 2020, Minister Rojas threatened that if Mr. Zhang did not comply, then he would convince ASEP to cancel the Sinolam License. Indeed, on November 25, 2020, ASEP issued a notice temporarily revoking the Sinolam License. Mr. Zhang had no choice but to facilitate those meetings between Minister Rojas and the NG Parties.

84.   While little information is publicly available, around the same time, in November 2020, AES and InterEnergy quietly formed a joint venture called Group Energy. InterEnergy held a majority stake of 51% and AES, through an intermediary, held the remaining 49% share. Mr. Gonzalez-Bunster, the Founder and Chairman of InterEnergy, became the President of Group Energy. He also occupied a board seat. AES also installed key AES executives in key roles at Group Energy, such as Mr. Juan Ignacio Rubiolo, who previously was President of MCAC, AES, and subsequently was appointed President of Group Energy in 2021, and Mr. Jeffrey MacKay, who previously was the Chief Financial Officer of MCAC, AES, and subsequently was appointed to the Board of Group Energy in 2021.

85. Group Energy subsequently acquired a Panamanian power company called Generadora de Gatún ("**GDG**"), which it appears to have acquired in or around March 2021. According to Public Deed No. 4,918, on March 31, 2021, senior executives of AES, such as Juan Ignacio Rubiolo, and InterEnergy were appointed to GDG's Board of Directors. Mr. Gonzalez-Bunster became the President of GDG and also occupied a board seat.

86. GDG then received a license in September 2021 for development of a power plant that was the exact size (in terms of installed capacity) and location of the planned NG Power Plant. And, at some point after NG Power was sold back to its original shareholders which occurred no earlier than 2021, NG Power apparently transferred its PPAs and regulatory rights, such as connectivity to the electricity grid and authorization to execute an environmental assessment study, to GDG.

87. The Group Energy joint venture and the formation of GDG have come under public scrutiny. There were no reported public tenders for the license to develop and operate the Power Plant. The power generation license was issued to GDG notwithstanding that NG Power's near-identical license had not yet been terminated or revoked.

88. On February 16, 2023, AES Panamá received the 49% stake in Group Energy previously held by AES Latin America, S. de R.L. ("**AES Latin America**") through an intra-company transfer.

89. GDG and AES also struck a deal to further benefit from the Panamanian LNG to power market: AES secured an exclusive 20-year fuel supply contract with GDG, whereby AES Terminal would supply LNG fuel at a 20% discount relative to market prices. It would do so via Colon LNG Marketing, which is a commercial branch of Costa Norte LNG Terminal, which owns the AES Terminal.

90.    The practical consequence of these actions is that construction of the NG Power Plant was completely stymied, and as a result, the NG Parties breached the Amended NG TUA for failure to purchase any LNG or any terminal services from Sinolam Terminal, under the Amended NG TUA or otherwise.

91.    Sinolam Power had no choice but to assign its PPAs to buyers who, to date, have paid Sinolam Power only a mere fraction of what the Sinolam PPAs are worth. Sinolam Power's advanced negotiations ceased with other purchasers of electricity for the excess capacity of 90 MW at the Sinolam Power Plant. It planned to supply 10 MW to the PCCP, which is a container terminal and port facility in the province of Colón on the Caribbean side of Panama. Sinolam Power also planned to supply power on the spot market, responding to tenders and calls issued by the Panamanian regulators.

92.    As a result of the acts described above, Sinolam Power's License was permanently cancelled on April 26, 2024.

93.    Defendants completed their scheme. AES, via AES Colon, owns a majority stake in the AES Power Plant. Group Energy, in which InterEnergy holds a 51% stake and AES's subsidiary AES Panamá owns a 49% stake, operates the GDG Power Plant. Defendants' conduct has resulted in there being no other players in the LNG-to-power market.

94.    AES also owns the only operational LNG Terminal in Panama. It contracted 76% of its storage capacity to supply the GDG Power Plant, the AES Power Plant, and other customers with long-term marketing rights.[2] Meanwhile, it rendered Sinolam Terminal's long-term contracts with two customers, Sinolam Power and NG Parties, worthless.

---

[2] *See* AES Panamá Investor Presentation May 2025, Slide 9.

Defendants' actions also deprived Sinolam Terminal of business opportunities for its excess terminal capacity with customers with long-term marketing rights.

95.   The injury to Plaintiffs has been substantial. Their investments alone exceed hundreds of millions of dollars already spent on project development and construction costs, fees for advisors, lawyers, and consultants, expenses for studies commissioned, and amounts already paid for under contracts breached or unfulfilled as a direct result of Defendants' misconduct.

96.   Plaintiffs' lost profits are even more substantial. Sinolam Power already had executed long-term PPAs with electricity distributors in Panama. It had excess capacity to provide electricity to major consumers, such as PCCP. And because ASEP had expanded the Sinolam Power Plant capacity from 325MW to 441MW, it also had excess capacity to sell electricity on the lucrative spot market. Sinolam Power's lost profits are approximately two billion dollars when measured over a 20-year period. Sinolam Terminal also lost significant profits that would have been generated under the usage agreements with Sinolam Power and the NG Parties.

97.   Additionally, Sinolam Terminal devised design and financing plans that would have allowed for subsequent expansion to take further advantage of Panama being a lucrative LNG hub. Sinolam Terminal's lost profits are approximately two billion dollars when measured over a 40-year period.[3]

98.   In sum, lost profits from Sinolam Terminal's customers, as well as expected electricity generation fees under the Sinolam PPAs and other electricity sales, place Plaintiffs' damages into the billions of dollars.

---

[3] Terminal infrastructure depreciates much more slowly and lasts longer than power plant infrastructure, hence the use of 20 years to estimate lost profits for Sinolam Power and 40 years to estimate lost profits for Sinolam Terminal.

99.    Mr. Zhang, the Chairman of Plaintiffs, continues to face intimidation and threats. He presently is in the process of relocating to the United States along with his family.

## COUNT ONE
### (Tortious Interference with Contracts between Sinolam Terminal and Sinolam Power)

100.    Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

101.    Through the acts described above, including but not limited to those acts specifically described in Paragraphs 39, 74-79, 84-88, 95, and 96 above, Defendants tortiously interfered with Sinolam Terminal's contracts with Sinolam Power.

102.    AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

103.    In April 2019, Sinolam Terminal and Sinolam Power entered into an LNG Terminal Use Agreement. On August 22, 2019, those parties entered into an LNG Sale and Storage Agreement. These valid contractual relationships existed between Sinolam Terminal and Sinolam Power, under which Sinolam Terminal would provide a range of LNG terminal services to Sinolam Power in exchange for terminal revenues.

104.    Defendants were aware of this contractual relationship between its market competitors. Defendants' intentional interference with these contracts resulted in performance breaches by both sides. Sinolam Power is, as a result of Defendants' tortious interference, in breach of contractual commitments to, *inter alia*, utilize terminal services provided by Sinolam Terminal and to pay Sinolam Terminal for those services. Likewise, as a result of the same interference, Sinolam Terminal is in breach of contractual obligations to, *inter alia*, provide terminal services and supply LNG to Sinolam Power. These breaches have had, in turn,

significant knock-on effects that threaten the viability of the Sinolam LNG Terminal as a whole.

105. In addition, Defendants' tortious interference has prevented and/or rendered more expensive or burdensome Sinolam Terminal's performance of its contractual obligations to Sinolam Power by, for example, preventing Sinolam Terminal from providing terminal services and from delivering LNG.

106. Likewise, Defendants' tortious interference has prevented and/or rendered more expensive or burdensome Sinolam Power's performance of its contractual obligations to Sinolam Terminal by, for example, stymying construction of the Sinolam Power Plant and thus Sinolam Power's ability to utilize terminal services and LNG provided by Sinolam Terminal.

107. Defendants' tortious interference has caused Sinolam Power to terminate its LNG purchasing relationship with Sinolam Terminal.

108. Defendants' tortious interference has caused Sinolam Terminal to terminate its LNG supplier relationship with Sinolam Power.

109. As a result of Defendants' tortious conduct, both Sinolam Power and Sinolam Terminal have been damaged. Defendants' actions constitute tortious interference with contracts that have caused and continue to cause each Plaintiff to suffer significant damages, in an amount to be proven at trial. Absent the Defendants' tortious interference, as described above, Sinolam Terminal would have received annual terminal fees from Sinolam Power totaling on average thirty million dollars over 40 years, and Sinolam Power would have had access to a reliable supply of LNG to fuel the Sinolam Power Plant.

27

110. Sinolam Power and Sinolam Terminal are entitled to judgment in their favor and against Defendants for the full amount of available damages.

## COUNT TWO
### (Tortious Interference with Contracts between Sinolam Terminal and NG Power)

111. Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

112. Through the acts described above, including but not limited to those acts specifically described in Paragraphs 61-64, 69-72, 76-79, 80-91, 95, and 97-98 above, Defendants tortiously interfered with Sinolam Terminal's contract with the NG Parties.

113. AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

114. A valid contractual relationship existed between Sinolam Terminal and the NG Parties per the 2018 NG TUA, under which Sinolam Terminal would provide a range of LNG terminal services in exchange for terminal revenues, and the subsequent Amended NG TUA in 2020, in which the NG Parties agreed to use the Sinolam LNG Terminal exclusively, among other things. Under these agreements, the NG Parties agreed to compensate Sinolam Terminal by paying terminal fees. These fees were expected to total $47.6 million annually over 40 years.

115. Defendants AES and InterEnergy were aware of this contractual relationship between their market competitors. They joined forces to intentionally interfere with this relationship through the incorporation of Group Energy, which owned the GDG Power Plant, and through subsequent execution of PPAs previously held by NG Power, as well as assumption of critical rights previously held by the NG Parties. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and

28

for the benefit of both parties, directly and through intermediaries such as local bureaucrats like Rojas, engaged in a campaign of coercion, intimidation, and threats to pry Plaintiffs' rights under the NG TUA and the Amended NG TUA from them, by, *inter alia,* forcing the shareholders of the NG Parties to return ownership to the previous shareholders; and (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, assumed rights to the permits, rights, licenses, and PPAs previously held by the NG Parties. As a result, the NG Parties breached their agreements with Sinolam Terminal by failing to utilize and/or pay for terminal services and/or LNG supplied by Sinolam Terminal and then terminated their LNG buyer relationship with Sinolam Terminal.

116. These breaches, and the NG Parties' termination of their buyer / seller relationship with Sinolam Terminal, deprived Sinolam Terminal of a crucial customer and its attendant terminal revenues. The removal of the NG Parties from the market in turn has had significant knock-on effects that threaten the viability of Sinolam Terminal as a whole.

117. In addition, the Defendants' tortious interference has prevented and/or rendered more expensive or burdensome Sinolam Terminal's performance of its duties to the NG Parties under the NG TUA and Amended NG TUA, including but not limited to its duties to provide terminal services and to deliver LNG.

118. As a result of Defendants' tortious conduct, Sinolam Terminal has thus been damaged. Defendants' actions constitute tortious interference with Sinolam Terminal's contract with

NG Power that has caused and will continue to cause Sinolam Terminal to suffer significant damages in an amount to be proven at trial.

119.    Sinolam Terminal is entitled to judgment in its favor and against Defendants for the full amount of available damages.

## COUNT THREE
**(Tortious Interference with Business Expectancy between Sinolam Power and ETESA)**

120.    Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

121.    Through the acts described above, including but not limited to those specifically described in Paragraphs 29-33, 35, 74-79, 82-88, 90-92, and 95-96 above, Defendants tortiously interfered with the Sinolam Power Concession granted by ETESA that authorized Sinolam Power to supply power to, and enter into contracts with, ENSA, EDEMET, and EDECHI.

122.    Sinolam Power's successful 2015 bid for the long-term contracting of power and energy supply for thermoelectric power generation plants to build and operate a 325 MW LNG-fired power plant in Puerto Pilón, Colón, created a valid business expectancy. Sinolam Power would ultimately supply power and meet the needs of three local distribution companies, ENSA, EDEMET, and EDECHI for fifteen years, beginning once the Sinolam Power Plant was built.

123.    Defendants were aware of the Sinolam Power Concession.

124.    AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

125.    Defendants intentionally interfered with this relationship. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct:

30

communicated with government regulators, such as those at ETESA, that they should require Sinolam Power to assign their contracts with ENSA, EDEMET, and EDECHI to third parties, which Defendants carried out from Virginia, resulting in Sinolam Power being forced to assign those contracts, which deprived Sinolam Power of the revenues those contracts would have generated; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, entered into PPAs previously held by the NG Parties and will continue to use the capacity at GDG to enter other business expectancies that Sinolam Power would have received given the excess capacity at the Sinolam Power Plant.

126. Defendants deprived Sinolam Power of its valid business expectancy in multiple ways, including by means of intimidation directed against Plaintiffs and their Chairman, to prevent their active participation in the market. AES and InterEnergy directly, and later through their jointly held Group Energy, procured bureaucratic delays as well as the ultimate revocation of the Sinolam License. This, in turn, led to the termination of the Sinolam Power Concession.

127. In addition, the Defendants' tortious interference has prevented Sinolam Power from delivering electricity to ETESA.

128. As a result of Defendants' tortious conduct, Sinolam Power has thus been damaged. Defendants' actions constitute tortious interference that has caused and continues to cause Sinolam Power to suffer significant damages, in an amount to be proven at trial.

129. Sinolam Power is entitled to judgment in its favor and against Defendants for the full amount of available damages.

### COUNT FOUR
**(Tortious Interference with PPA between Sinolam Power and ENSA)**

130. Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

131. Through the acts described above, including but not limited to those acts described in Paragraphs 29-33, 35, 74-79, 82-88, 90-92, and 95-96 above, Defendants tortiously interfered with Sinolam Power's contract to supply power to ENSA.

132. AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

133. Following Sinolam Power's successful 2015 bid for the long-term contracting of power and energy supply for thermoelectric power generation plants to build and operate a 325 MW LNG-fired power plant in Puerto Pilón, Colón, Sinolam Power would ultimately supply power and energy and meet the needs of three local distribution companies. On January 8, 2016, Sinolam Power entered into a PPA pursuant to which it would supply 126MW to ENSA for 15 years.

134. Defendants were aware of the PPA between Sinolam Power and ENSA.

135. Defendants intentionally interfered with this relationship through acts that made Sinolam Power unable to perform its obligations to ENSA, thereby depriving Sinolam Power of the revenue from the contract with ENSA. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: communicated with government regulators and/or electricity distributors, such as those at ENSA, that they

32

should assign or terminate the PPA between Sinolam Power and ENSA, which they carried out in Virginia, which resulted in the assignment of the PPA; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, engaged in the following conduct: communicated with government regulators and electricity distributors, such as those at ENSA, that they should assign or terminate the PPA between Sinolam Power and ENSA, which resulted in the assignment of the PPA. The loss of the PPA with ENSA also had knock-on effects for Sinolam Terminal as its customer, the Sinolam Power Plant, would have reduced demand for LNG.

136.    As a result of Defendants' tortious conduct, Plaintiffs have thus been damaged. Defendants' actions constitute tortious interference with contract that have caused and continue to cause Sinolam Power to suffer significant damages, in an amount to be proven at trial.

137.    Sinolam Power is entitled to judgment in its favor and against Defendants for the full amount of available damages.

## COUNT FIVE
### (Tortious Interference with PPA between Sinolam Power and EDEMET)

138.    Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

139.    Through the acts described above, including but not limited to the acts described in Paragraphs 29-33, 35, 74-79, 82-88, 90-92, and 95-96 above, Defendants tortiously interfered with Sinolam Power's contract to supply power to EDEMET.

140. AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

141. Following Sinolam Power's successful 2015 bid for the long-term contracting of power and energy supply for thermoelectric power generation plants to build and operate a 325 MW LNG-fired power plant in Puerto Pilón, Colón, Sinolam Power would ultimately supply power and energy and meet the needs of three local distribution companies. Sinolam Power subsequently entered into a PPA with EDEMET pursuant to which it would supply 196MW to EDEMET for 15 years on January 8, 2016.

142. Defendants were aware of the PPA between Sinolam Power and EDEMET.

143. Defendants intentionally interfered with this relationship through acts that made Sinolam Power unable to perform its obligations to EDEMET, thereby depriving Sinolam Power of the revenue from the contract with EDEMET. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: communicated with government regulators and/or electricity distributors, such as those at EDEMET, that they should assign or terminate the PPA between Sinolam Power and EDEMET, which they carried out in Virginia, which resulted in the assignment of the PPA; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, engaged in the following conduct: communicated with government regulators and electricity distributors, such as those at EDEMET, that they should assign or terminate the

PPA between Sinolam Power and EDEMET, which resulted in the assignment of the PPA. The loss of the PPA with EDEMET also had knock-on effects for Sinolam Terminal as its customer, the Sinolam Power Plant, would have reduced demand for LNG.

144. As a result of Defendants' tortious conduct, Plaintiffs have thus been damaged. Defendants' actions constitute tortious interference with contract that have caused and continue to cause Sinolam Power to suffer significant damages in an amount to be proven at trial.

145. Sinolam Power is entitled to judgment in its favor and against Defendants for the full amount of available damages.

## COUNT SIX
### (Tortious Interference with PPA between Sinolam Power and EDECHI)

146. Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

147. Through the acts described above, including but not limited to those described in Paragraphs 29-33, 35, 74-79, 82-88, 90-92, and 95-96 above, Defendants tortiously interfered with Sinolam Power's contract to supply power to EDECHI.

148. AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

149. Following Sinolam Power's successful 2015 bid for the long-term contracting of power and energy supply for thermoelectric power generation plants to build and operate a 325 MW LNG-fired power plant in Puerto Pilón, Colón, Sinolam Power would ultimately supply power and energy and meet the needs of three local distribution companies. On January 8, 2016, Sinolam Power entered into a PPA with EDECHI pursuant to which it would supply 28MW to EDECHI for 15 years.

150. Defendants were aware of the PPA between Sinolam Power and EDECHI.

35

151. Defendants intentionally interfered with this relationship through acts that made Sinolam Power unable to perform its obligations to EDECHI, thereby depriving Sinolam Power of the revenue from the contract with EDECHI. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: communicated with government regulators and/or electricity distributors, such as those at EDECHI, that they should assign or terminate the PPA between Sinolam Power and EDECHI, which they carried out in Virginia, which resulted in the assignment of the PPA; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, communicated with government regulators and/or electricity distributors, such as those at EDECHI, that they should assign or terminate the PPA between Sinolam Power and EDECHI, which resulted in the assignment of the PPA.  The loss of the PPA with EDECHI also had knock-on effects for Sinolam Terminal as its customer, the Sinolam Power Plant, would have reduced demand for LNG.

152. As a result of Defendants' tortious conduct, Plaintiffs have thus been damaged. Defendants' actions constitute tortious interference with contract that have caused and continue to cause Sinolam Power to suffer significant damages in an amount to be proven at trial.

153. Sinolam Power is entitled to judgment in its favor and against Defendants for the full amount of available damages.

**COUNT SEVEN**
**(Tortious Interference with Business Expectancy of Sinolam Terminal with Anticipated Customers)**

154.    Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

155.    Through the acts described above, including but not limited to those acts described in Paragraphs 37-39, 60-64, 67-90, 92, and 95-98 above, Defendants tortiously interfered with Sinolam Terminal's anticipated contracts with customers other than Sinolam Power and the NG Parties.

156.    AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

157.    Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: interfered with valid contractual relationships between Sinolam Terminal and Sinolam Power and the NG Parties as described in COUNT ONE and COUNT TWO, which they carried out from Virginia, which resulted in Sinolam being unable to finance construction and operation of the terminal portion of the Sinolam Project; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, secured an exclusive 20-year fuel supply contract for its wholly owned subsidiary, GDG, from AES Terminal, whereas Sinolam Terminal otherwise would have supplied LNG

37

terminal services to the NG Parties, revenues from which would have financed expansion of the LNG Terminal such that it could provide LNG terminal services to other customers.

158. These valid business expectancies would have come to fruition had Defendants not wrongfully interfered with Sinolam Terminal as described above. Defendants were aware of these potential contractual relationships between Sinolam Terminal and other companies. Sinolam Terminal expected that 25% of its revenues would be generated through trading or long-term agreements with other customers. These prospective customers included the Municipality of Colón. Additionally, Sinolam Terminal had established a natural gas trading company to expand its natural gas customer base in the United States and Caribbean region. Sinolam Terminal would have provided terminal services to those customers.

159. In addition, LNG is a fungible commodity, sold on world markets, at spot prices. There are always willing buyers in the LNG market. Sinolam Terminal could have sold to any number of these prospective customers given the nature of the Sinolam Terminal, which would have allowed for cargoes of LNG to be transported to and from tankers and trading vessels in the region.

160. Thus, absent the interference described above, it is nearly certain that these expectancies would have come to fruition. Sinolam Terminal's estimate that 25% of its revenues would come from the above identified customers is based on the capacity of Sinolam Terminal and the expected trading activity that would flow through the Panama Canal. Sinolam Terminal was in negotiations with the Municipality of Colón regarding the supply of LNG.

161. As a result of Defendants' tortious conduct, Sinolam Terminal has thus been damaged. Defendants' actions constitute tortious interference with business expectancies that have

caused and continue to cause Sinolam Terminal to suffer significant damages in an amount to be proven at trial.

162. Sinolam Terminal is entitled to judgment in its favor and against Defendants for the full amount of available damages.

## COUNT EIGHT
**(Tortious Interference with Business Expectancy of Sinolam Power with Anticipated Customers)**

163. Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

164. Through the acts described above, including but not limited to those described in Paragraphs 26-33, 35, 74-79, 82-88, 91-92, and 95-98 above, Defendants tortiously interfered with Sinolam Power's anticipated contracts with customers beyond the existing PPAs with ENSA, EDEMET, and EDECHI.

165. AES orchestrated, supervised, and managed this tortious interference, and the other Defendants participated in the ways described herein.

166. Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: conducted the activity in COUNTS THREE, FOUR, FIVE, and SIX, including communicating with government regulators to terminate the Sinolam Power Concession, which actions were carried out in Virginia and which resulted in Sinolam Power not being able to execute additional medium- or long-term contracts with the excess capacity of the Sinolam Power Plant beyond the three PPAs it had finalized, as well as compete for tenders issued by government regulators for supply of electricity on the spot market; (b) AES and InterEnergy formed Group Energy, and populated its board

with AES and InterEnergy directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, engaged in the following conduct: conducted the activity in COUNTS THREE, FOUR, FIVE, and SIX, including communicating with government regulators to terminate the Sinolam Power Concession, which it carried out under instructions from Virginia, which resulted in Sinolam Power not being able to execute additional medium- or long-term contracts for the excess capacity of the power plant beyond the three PPAs it had finalized, as well as compete for tenders issued by government regulators for supply of electricity on the spot market.

167. These valid business expectancies would have come to fruition had Defendants not wrongfully interfered, as described above. Sinolam Power reasonably expected to execute long-term agreements for electricity distribution to identified customers, as well as contracts on the spot market for power and additional PPAs with electricity distributors. Electricity is a fungible commodity, for which there is a competitive spot market, in which there are always willing buyers. The Sinolam Power Plant was licensed. It was connected to the transmission grid. It is thus virtually certain that, absent the tortious interference alleged herein, the expectancies set out in this Count would have been realized and that Sinolam Power would have sold its excess capacity on the spot market. It is nearly certain that Sinolam Power would have sold excess capacity following an increase in installed capacity of 90MW in excess of the 350MW allocated under its existing PPAs. These expected opportunities would have provided future economic benefit to Sinolam Power, thus establishing a business expectancy.

40

168.  In addition to selling excess capacity on the spot market, Sinolam Power was poised to enter into a private PPA with the PCCP for at least 10 MW, which would have generated hundreds of millions of dollars in revenues. This expectancy was also virtually certain to materialize absent the tortious interference alleged herein.

169.  Defendants were aware of these expected contractual relationships between Sinolam Power and these entities. Defendants intentionally interfered with these expected relationships as described above, thereby depriving the Sinolam Power of other customers and the attendant power generation revenues.

170.  As a result of Defendants' tortious conduct, Plaintiffs have thus been damaged. Defendants' actions constitute tortious interference with business expectancies that have caused and continue to cause Sinolam Power to suffer significant damages in an amount to be proven at trial.

171.  Plaintiffs are entitled to judgment in their favor and against Defendants for the full amount of available damages.

**COUNT NINE**
**(Statutory Civil Conspiracy, Va. Code Ann. §§ 18.2-499 through 500)**

172.  Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

173.  Through the acts described above, including but not limited to those described in Paragraphs 28-33, 35-39, 61-64, and 69-98 above, Defendants conspired to willfully and maliciously interfere with Plaintiffs' contracts and business expectancies, resulting in damage to Plaintiffs in violation of Virginia Code Ann. §§ 18.2-499 through 500.

41

174.    AES orchestrated, supervised, and managed this conspiracy, which emanated and was directed and executed from Arlington, Virginia, and the other Defendants participated in the ways described herein.

175.    Specifically, upon information and belief: (a) AES, from its offices in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: used intimidation, coercion, and threats to procure that Group Energy would receive NG Parties' rights, permits, licenses, and PPAs, used intimidation, coercion, and threats to procure that the counterparties to Sinolam Terminal's contracts would be in breach of those agreements and/or unable to perform them, used intimidation, coercion, and threats to procure that Sinolam Power could not capitalize on business expectancies using the excess capacity of 90 MW at the Sinolam Power Plant, used intimidation, coercion, and threats to procure that Sinolam Terminal could not capitalize on business expectancies using the excess capacity at the Sinolam LNG Terminal; (b) AES and InterEnergy formed Group Energy, and populated its board with AES and InterEnergy Directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, engaged in the following conduct: assumed rights to the permits, rights, licenses, and PPAs previously held by the NG Parties, tortiously interfered with the terminal agreements between Plaintiffs, resulted in performance breaches by both sides, and secured an exclusive 20-year fuel supply contract for its wholly owned subsidiary, GDG, from AES Terminal.

42

176. Defendants' conspiracy has resulted in tortious interference with the contracts and expectancies, and resulting damages, described in COUNTS ONE through EIGHT above. The conspiracy has also prevented Plaintiffs from pursing any future opportunities, notwithstanding Sinolam Power and Sinolam Terminal both had extra capacity to enter into spot, trading, and long-term relationships with customers.

177. As a result, Plaintiffs have been damaged. Plaintiffs' investments exceed one hundred million dollars in funds spent on project development and construction costs, project advisors and consultants, and contracts breached as a result of Defendants' conduct. Plaintiffs suffered lost profits, including the loss of expected electricity generation fees in addition to lost terminal revenues which are expected to total in billions of dollars.

178. Defendants' actions constitute statutory civil conspiracy in violation of Virginia Code §§ 18.2-499 through 500 that have caused and continue to cause Plaintiffs to suffer significant damages in an amount to be proven at trial. Plaintiffs have further incurred and will continue to incur attorney fees and legal costs and expenses in pursuing their legal rights.

179. Plaintiffs are entitled to judgment in their favor and against Defendants for the full amount of available damages and to have those damages trebled pursuant to Virginia Code § 18.2-500(A).

**COUNT TEN**
**(Common Law Conspiracy)**

180. Plaintiffs incorporate by reference the foregoing paragraphs of the Amended Complaint as if restated fully herein.

181. Through the acts described above, including but not limited to those described in Paragraphs 28-33, 35-39, 61-64, and 69-98 above, Defendants conspired to willfully and

43

maliciously interfere with Plaintiffs' contracts and business expectancies, resulting in damage to Plaintiffs and constituting conspiracy under Virginia common law.

182. AES orchestrated, supervised, and managed this conspiracy, which emanated and was directed and executed from Arlington, Virginia, and the other Defendants participated in the ways described herein.

183.  Specifically, upon information and belief: (a) AES, from its officers in Arlington Virginia, in combination with InterEnergy and Group Energy, and for the benefit of all three parties, engaged in the following conduct: used intimidation, coercion, and threats to procure that Group Energy would receive NG Parties' rights, permits, licenses, and PPAs, used intimidation, coercion, and threats to procure that the counterparties to Sinolam Terminal's contracts would be in breach of those agreements and/or unable to perform them; used intimidation, coercion, and threats to procure that Sinolam Power could not capitalize on business expectancies using the excess capacity of 90 MW at the Sinolam Power Plant; used intimidation, coercion, and threats to procure that Sinolam Terminal could not capitalize on business expectancies using the excess capacity at the Sinolam Terminal; (b) AES and InterEnergy formed Group Energy and populated its board with AES and InterEnergy Directors, for the purposes of enabling this interference; and (c) Group Energy, through both its local representatives and its representatives in Virginia, such as Group Energy directors and officers who also performed other senior functions at AES in Virginia, engaged in the following conduct: assumed rights to the permits, rights, licenses, and PPAs previously held by the NG Parties, tortiously interfered with the terminal agreements between Plaintiffs, resulted in performance breaches by both sides, and secured an

44

exclusive 20-year fuel supply contract for its wholly owned subsidiary, GDG, from AES Terminal.

184. Defendants' conspiracy has resulted in tortious interference with the contracts and expectancies, and resulting damages, described in COUNTS ONE through EIGHT above. In addition, the conspiracy has prevented Plaintiffs from pursing any future opportunity to expand their presence in Panama's energy market, notwithstanding Sinolam Power and Sinolam Terminal both had extra capacity to enter into spot, trading, and long-term relationships with customers.

185. As a result, Plaintiffs have been damaged. Plaintiffs' investments exceed a hundred million dollars in funds spent on project development and construction costs, project advisors and consultants, and contracts breached as a result of Defendants' conduct. Plaintiffs' lost profits, including the loss of expected electricity generation fees in addition to lost terminal revenues, are expected in the billions of dollars.

186. Defendants' actions constitute civil conspiracy in violation of Virginia common law and have caused and continue to cause Plaintiffs to suffer significant damages in an amount to be proven at trial.

187. Plaintiffs are entitled to judgment in their favor and against Defendants for the full amount of available damages.

## PRAYER FOR RELIEF

188. Plaintiffs respectfully request that the Court:

a. Award compensatory damages in the amount of four billion dollars or the amount proven at trial, plus pre-judgment and post-judgment interest at the statutory rate;

b. Award treble damages for Count Nine pursuant to Virginia Code § 18.2-500(A);

45

    c.   Award Plaintiffs costs and reasonable attorneys' fees for Count Nine, pursuant to

         Virginia Code § 18.2-500(A); and

    d.   Grant such other and further relief as the Court deems fit.

**JURY DEMAND**

189.   Plaintiffs hereby demand a jury trial.

March 19, 2026         Respectfully submitted,

 

_____
Thomas F. Urban II (VSB No. 40540)
Jason E. Ohana (VSB No. 82485)
Kelley C. Holland (VSB No. 79627)
Willcox & Savage, PC
8201 Greensboro Drive, Suite 1001
McLean, Virginia 22102
(703) 550-6354
(757) 628-5566 Facsimile
tfurban@wilsav.com
johana@wilsav.com
kholland@wilsav.com

Viren Mascarenhas (pro hac vice being filed)
Aubry Alexis Menish (pro hac vice being filed)
Margaret T. Artz (pro hac vice being filed)
Mascarenhas Law PLLC
125 Park Avenue
25th Floor
New York, NY 10017

*Counsel for Plaintiffs Sinolam LNG Terminal, S.A. and Sinolam Smarter Energy LNG Power Co.*